UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DISTRIBUIDORA DE DISCOS KAREN C.
POR A.; KAREN PUBLISHING COMPANY,

               Plaintiffs,

               -v-

UNIVERSAL MUSIC GROUP, INC., d/b/a
UNIVERSAL MUSIC LATIN
ENTERTAINMENT, CAPITOL RECORDS
LLC d/b/a CAPITOL LATIN MUSIC, E.M.I.
MUSIC NETHERLANDS B.V., JUAN LUIS
GUERRA,

               Defendants.

JUAN LUIS GUERRA, UNIVERSAL MUSICA,
INC., CAPITOL RECORDS LLC, UNIVERSAL
MUSIC GROUP, INC.,

               Counterclaimants/
               Third-Party Plaintiffs,

               -v-

DISTRIBUIDORA DE DISCOS KAREN C.
POR A., KAREN PUBLISHING COMPANY,

               Counter-Defendants,

               and

DISTRIBUIDORA DE DISCOS KAREN S.R.L.,
BIENVENIDO RODRÍGUEZ,

               Third-Party Defendants.

13-CV-7706 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

     This action involves a dispute between a recording artist and his former music label and publisher over the ownership of copyrights in the compositions of a number of Latin pop songs.

The artist and his new publisher now move for summary judgment on the copyright infringement and declaratory judgment claims asserted against them by his old label and publisher, as well as some of their counterclaims.  (Dkt. No. 122).  For the reasons that follow, the motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The Court assumes some familiarity with the background of this case, as laid out in the Court's previous opinions.  *See Distribuidora De Discos Karen C. Por A. v. Universal Music Grp., Inc.*, No. 13 Civ. 7706, 2017 WL 1019697, at \*1–2 (S.D.N.Y. Mar. 15, 2017); *Distribuidora De Discos Karen C. Por A. v. Universal Music Grp., Inc.*, No. 13 Civ. 7706, 2015 WL 4041993, at \*1–3 (S.D.N.Y. July 2, 2015).  The facts relevant to this motion are taken from the parties' Local Rule 56.1 statements of undisputed facts and are not subject to a genuine dispute except where otherwise noted.

Juan Luis Guerra is "is a composer, musician and recording artist" who resides in the Dominican Republic.  (Dkt. No. 91 ¶ 9.)  For over two decades, Guerra had a business relationship with record label Distribuidora de Discos Karen, C. por A. ("DDK") and music publisher Karen Publishing Company ("Karen Publishing").  After that relationship was terminated, Guerra entered into an agreement with Universal Musica, Inc. ("UMU") to license and collect royalties for Guerra's musical compositions.  (Dkt. Nos. 130 & 139 "SUF" ¶¶ 27, 47.)  But Guerra and his old record label and publisher continue to dispute the ownership of copyrights in at least 76 compositions[1] of Guerra's songs that were originally recorded while Guerra was represented by DDK.  (SUF ¶¶ 54–55; *see* Dkt. No. 31 at Exh. A; Dkt. No. 91-1.)

---

[1]     Listed in Column A of Appendix A to this Opinion and Order.

In the 1970s, Guerra first met Bienvenido Rodríguez, founder, owner, and president of DDK, and Karen Publishing.[2] (SUF ¶ 1.)  Guerra first entered into an exclusive recording agreement, to record one album for DDK, in 1985 (the "1985 Recording Agreement").  (SUF ¶¶ 4–5; Dkt. No. 125-3.)  This was the first of a number of agreements relevant to this dispute over the ownership of the composition copyrights in Guerra's songs.  These contracts between Guerra and the Karen Parties were executed in the Dominican Republic, and were originally drafted and executed in Spanish.[3]  (*See, e.g.*, Dkt. No. 125-3 at 5, 10; Dkt. No. 125-10 at 9, 19.) The parties agree that the laws of the Dominican Republic concerning the interpretation of copyright contracts apply in this case.  (*See* SUF ¶¶ 18, 41, 42.)

In 1988, Guerra and DDK signed a new agreement (the "1988 Base Agreement"), which required Guerra to record multiple albums for DDK and prevented him from re-recording the compositions of the songs on the albums until five years after the agreement expired.  (SUF ¶¶ 7–8; Dkt. No. 125-4.)  Neither the 1985 Recording Agreement, nor the 1988 Base Agreement, granted DDK the rights to Guerra's underlying musical compositions.  (SUF ¶ 10.)  However, in "Cesión Documents" executed between 1986 and 1989, Guerra "assign[ed] to DDK the rights in twenty-one of his compositions that were embodied in the recordings he made for DDK."  (SUF ¶ 11; Dkt. No. 125-5.)  In September 1992, the parties modified the 1988 Base Agreement (the "1992 Modification") with regard to royalty rates.  (SUF ¶ 14; Dkt. No. 125-6.)  But again, the 1992 Modification did not grant DDK any rights in Guerra's underlying musical compositions. (SUF ¶ 15.)

---

[2]     Distribuidora de Discos Karen, C. por A. (now known as Distribuidora de Discos Karen S.R.L. ("DDK S.R.L.")), and Karen Publishing (collectively with Rodríguez, "the Karen Parties") are Plaintiffs, Counter-Defendants, Third-Party Defendants, and Third-Party Plaintiffs in this action.  (Dkt. No. 130 at 2.)

[3]     The Court relies on the certified English translations of these documents.  *See Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 709 (S.D.N.Y. 2016).

Later that year, Guerra and Karen Publishing entered into a publishing agreement (the "1992 Agreement"), which granted Karen Publishing the exclusive right to exploit 46 specific compositions of Guerra's, worldwide.[4]  (SUF ¶¶ 16–17; Dkt. No. 125-7 at 3, 6.)  The 1992 Agreement provided that Guerra would receive 70% of the income from licensing reproductions of the compositions, and Karen Publishing would receive 30%.  (SUF ¶ 19; Dkt. No. 125-7 at 4.) And as particularly relevant here, paragraph fourteen of the 1992 Agreement provides:

> The assignment of the rights agreed to herein does not extend to the modes of use or medium of dissemination not existing or unknown at the time of the assignment. Now, then, if in the future PUBLISHER should wish to exploit the rights using a new mode or new medium currently unknown, it shall irrefutably communicate this fact to AUTHOR, it being understood that the same is in full agreement therewith if, within a term of fifteen (15) days, he does not voice any reservation.

(Dkt. No. 125-7 at 5.)

The parties dispute whether "digital downloads or streaming on the Internet" constituted a mode or medium "not existing or unknown at the time" of the 1992 Agreement.  (SUF ¶ 22.) But in his deposition, "Rodríguez admitted that he was not aware of any music being exploited on the Internet at the time of the 1992 Administration Agreement."  (SUF ¶ 23; Dkt. No. 133-1 at 62:19–66:18.)

In 1994, an amendment to the 1992 Agreement (the "1994 Amendment") expanded the list of specific Guerra compositions over which Karen Publishing had exclusive publishing rights

---

[4]      The 46 compositions are:  *A Pedir Su Mano*, *Acompáñeme Civil*, *Amigos*, *Amor De Conuco*, *Ángel Para Una Tambora*, *Ay Mujer*, *Ayer*, *Bachata Rosa*, *Burbujas De Amor*, *Canción De Cuna Para Una Mujer*, *Carta De Amor*, *Como Abeja Al Panal*, *Coronita De Flores*, *Cuando Te Beso*, *De Tu Boca*, *Elena*, *Ella Dice*, *Estrellitas Y Duendes*, *Frío Frío*, *Guavaberry*, *Hasta Que Me Olvides*, *Informe Semanal*, *La Bilirrubina*, *La Gallera*, *Lágrimas De Un Pino Verde*, *Mal De Amor*, *Me Enamoro De Ella*, *Naboria Daca Mayanimacana*, *No Me Acostumbro*, *Nuestro Amor*, *Ojalá Que Llueva Café*, *Razones*, *Reforéstame*, *Reina Mía*, *Réquiem Sobre El Jaragua*, *Rock-A-Fiesta*, *Rompiendo Fuente*, *Rosalía*, *Señales De Humo*, *Si Saliera Petróleo*, *Si Tú Te Vas*, *Sobremesa*, *Te Ofrezco*, *Te Propongo*, *Tú*, and *Visa Para Un Sueño*.  (Dkt. No. 125-7 at 6.)

4

from 46 to 55.[5]  (SUF ¶ 17; Dkt. No. 125-7.)  The 1992 Agreement and the 1994 Amendment,

however, "did not give Karen any rights to any other compositions that Guerra had created or

that he would create in the future."[6]  (SUF ¶ 17.)  When Rodríguez was asked in his deposition,

as the Rule 30(b)(6) witness representing DDK and Karen Publishing, whether he was able to

"identify any provision [in the 1992 Agreement or 1994 Amendment] that gives the Karen

companies rights to all compositions that Mr. Guerra had authored"—beyond those specifically

listed—Rodríguez responded that he could not identify such a provision.  (Dkt. No. 125-12 at

66:13–67:17; SUF ¶ 37.)[7]

In the course of its relationship with Guerra, Karen Publishing obtained registrations

from the United States Copyright Office with respect to dozens of Guerra's musical

compositions, including many that are listed in the 1992 Agreement and 1994 Amendment, as

well as a number of additional compositions.[8]  (SUF ¶ 54; Dkt. Nos. 133-17 through 133-22.)

But the beginning of the end of that relationship came in 2006.

Guerra's counsel sent a letter to Karen on May 3, 2006, proposing "termination of the

existing agreements among the parties" and "assignment in favor of [Guerra] of 100% of all

---

[5]      The nine compositions added in 1994 were: *El Farolito*, *Los Pajaritos*, *El Beso De La Ciguatera*, *Lacrimosa*, *Oficio De Enamorado*, *July 19th*, *La Cosquillita*, *Viviré*, and *Fogaraté*.  (Dkt. No. 125-7 at 7.)

[6]      The Karen Parties do not dispute this specific point in their Local Rule 56.1 statement.  (*See* SUF ¶ 17.)  Where the Karen Parties have not specifically controverted a fact in the Movants' statement of undisputed facts, they are "deemed [to have] admitted" that fact to the extent it finds support in the summary judgment record.  *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003); *see* Local Civil Rule 56.1(c), (d).

[7]      As relevant to this point, the parties dispute whether "[t]he law of the Dominican Republic prohibits an author from transferring rights to future works that have not yet been created."  (SUF ¶ 18.)

[8]      The parties dispute what exactly Guerra knew about these copyright registrations.  (SUF ¶ 53.)  Also, although the Karen Parties allege infringement of copyrights in 74 compositions, Movants point out that the Karen Parties have not provided evidence of registration as to one of these compositions in particular: *Por Eso Ahora*.  (SUF ¶ 54.)

publishing rights filed in favor of the publisher company." (SUF ¶ 26; Dkt. No. 125-9 at 2.)

Guerra and DDK subsequently executed an "Agreement for the Partial Release of Obligations"

on October 24, 2006 (the "2006 Release Agreement"). (SUF ¶ 27; Dkt. No. 125-10 at 2.)

(Guerra admits that he signed this agreement without reading it. (SUF ¶ 57.))

Several paragraphs from the 2006 Release Agreement are relevant to the disagreement at

the heart of this case. The paragraph labeled "Whereas No. 11" in the preamble to the agreement

states that the parties "have reached a consensus leading to a settlement agreement in order to

formally waive their respective rights under [certain] previous agreements and to resolve their

differences through these means." (Dkt. No. 125-10 at 4.) However, the parties dispute the

proper translation of this paragraph, and whether it means that the parties were waiving their

rights under *all existing agreements* between the parties, or merely the two agreements

*specifically referenced* in the preamble to the agreement: the 1988 Base Agreement and the 1992

Modification. (SUF ¶ 28.)

Also relevant is paragraph the "Seventh" of the 2006 Release Agreement, which provides

that:

> With regard to the control and administration of the earnings to be received in
> royalties and public broadcasts of the compositions of THE ARTIST made under
> THE BASE AGREEMENT and THE MODIFICATIONS, KAREN will retain the
> rights and obligations established by the agreement between the parties,
> maintaining the pre-established proportion and means of collection, i.e. 70% for the
> ARTIST and 30% for KAREN, for a sole and in-evocable term of three (3) years,
> as of the signing of this agreement. At the end of said period, the administration of
> the aforementioned aspects will pass to THE ARTIST with no consideration due
> KAREN, with the understanding that this will not affect the authorizations licenses
> or permissions granted to KAREN by THE ARTIST to exercise the rights provided
> for in section FOUR of this agreement, which will be deemed as renewed and
> current without further request while said rights remain valid.

(Dkt. No. 125-10 at 7.)  The parties dispute the import of this paragraph.[9]  (*See* SUF ¶¶ 33–36.)
And ultimately, the parties dispute the impact of the 2006 Release Agreement on the rights of
Karen Publishing in the copyrights to the musical compositions.  (SUF ¶¶ 58–59.)

Apart from the text of the 2006 Release Agreement, the parties point to various
communications and statements in testimony to help explicate the effect of the agreement on
ownership of the composition copyrights. For example, in October 2009, counsel for Guerra sent
a letter and "bailiff's notice" to Karen, notifying Karen that pursuant to paragraph "Seventh" of
the agreement, Guerra would "have the right to receive all of the profits received for the
authorship rights . . . arising from his songs" from October 23, 2009 onward.  (Dkt. No. 125-13
at 3 (emphasis omitted); *see also* SUF ¶¶ 43–44; Dkt. No. 125-14.)

Subsequently, in June 2010, Rodríguez wrote a letter to Guerra's attorney, which
recognized that Karen had agreed to the "waiver of our copyrights to the works of Juan Luis
[Guerra]" in the 2006 Release Agreement.  (SUF ¶ 45; Dkt. No. 125-15 at 2.)  And in a 2013
deposition in another action, Rodríguez testified that Guerra received his "rights as an author" in
2009, including "[t]he rights to his compositions that he recorded with Karen."  (SUF ¶ 46; Dkt.
No. 125-16 at 229:16–20.)

Understanding any rights that the Karen Parties had in the copyrights of his compositions
to have terminated in the wake of the 2006 Release Agreement, Guerra entered into an
"Exclusive Administration Agreement" with UMU in 2014 (the "UMU Agreement"), which
granted UMU the right to exploit and collect royalties for Guerra's compositions.  (SUF ¶ 47;

---

[9]     As relevant to this paragraph and the 2006 Release Agreement more generally,
the parties also dispute whether "[t]he law of the Dominican Republic requires that music
publishers collect royalties and provide financial statements to the artist, not the other way
around" (SUF ¶ 41), and whether the "Dominican law doctrine of '*in dubio pro autore*'"—which
"requires that contracts in the recorded music industry be construed in favor of the artist, as the
original copyright owner"—should still be applied (SUF ¶ 42).

Dkt. No. 125-17.)  However, the Karen Parties have continued to operate as if they retained those copyrights.  For instance, they have "exploit[ed] at least 42 of Guerra's compositions since July 27, 2012."  (SUF ¶ 50; *see* Dkt. No. 125-18.)  And through the authorization of the Karen Parties, the Harry Fox Agency and the American Society of Composers, Authors and Publishers licensed the exploitation of another 27 of Guerra's compositions.  (SUF ¶¶ 49, 51–52.)

### B.  Procedural History

On October 30, 2013, Plaintiffs DDK and Karen Publishing initiated this action against Guerra, UMG Recordings, Inc.[10] doing business as Universal Music Latin Entertainment ("UMG"), Capital Records LLC doing business as Capitol Latin Music ("Capitol"), and E.M.I. Music Netherlands B.V. ("E.M.I."), alleging copyright infringement in connection with Plaintiffs' exclusive right to reproduce and distribute Guerra's musical compositions.  (Dkt. No. 1.)  The original complaint alleged a single claim of copyright infringement, in connection with Defendants' release of the "Asondeguerra Tour" CD and DVD, which contained newly recorded versions of nine songs in which Plaintiffs claim to hold the exclusive composition copyrights. (Dkt. No. 1 ¶¶ 20–22.)

The Court allowed UMU to intervene and file, with Guerra, a counterclaim against DDK and Karen Publishing, and a third-party complaint against DDK S.R.L. and Rodríguez.  (Dkt. No. 30.)  Guerra and UMU sought a declaratory judgment that Guerra was the proper owner of the composition copyrights (Dkt. No. 31, Counterclaim ¶¶ 45–50), and asserted a claim that the Karen Parties infringed the copyrights of Guerra and UMU by licensing and exploiting the compositions of 70 of Guerra's songs without authorization (*id.* ¶¶ 51–57, Exh. A).[11]

---

[10]     UMG Recordings, Inc. was incorrectly sued as Universal Music Group, Inc. (Dkt. No. 124 at 1.)

[11]     The 70 compositions for which Guerra and UMU allege that the Karen Parties have infringed the copyrights are set forth in Column C of Appendix A to this Opinion.

Rodríguez, in turn, filed third-party counterclaims against Guerra and UMU.  (Dkt. No. 56 at 16–26.)  Rodríguez sought declaratory judgments that: (i) certain copyright registrations issued to Editora El Conuco, Inc. (a company co-owned by Guerra) for Guerra's songs are invalid (Dkt. No. 56, Counterclaim ¶¶ 20, 30–33); and (ii) the 2006 Release Agreement was unenforceable because Guerra failed to perform material obligations of the agreement (*id.* ¶¶ 35–36).  DDK and Karen Publishing subsequently sought leave to file a supplemented complaint, to add a claim seeking a declaration that the 2006 Release Agreement was unenforceable due to Guerra's failure to perform (Dkt. No. 59-1 ¶¶ 45–48), and to allege copyright infringement against Guerra and UMU for infringement of 74 compositions[12] (*id.* ¶¶ 49–55; Dkt. No. 59-2).

Guerra and UMU then moved to dismiss Rodríguez's third-party counterclaims.  (Dkt. No. 67).  And the Karen Parties moved for judgment on the pleadings as to Guerra and UMU's counterclaims and third-party complaint, on the ground that the claims were time-barred.  (Dkt. Nos. 63, 65.)  In an Opinion and Order of March 15, 2017 (Dkt. No. 90.), the Court resolved the motion to file a supplemental pleading (Dkt. No. 58), the motion to dismiss Rodríguez's third-party counterclaim (Dkt. No. 67), and the motion for judgment on the pleadings (Dkt. No. 63).

The Court permitted DDK and Karen Publishing to supplement their complaint to add the additional copyright infringement claim, and held that Rodríguez's third-party counterclaims survived to the extent they raised "issues of the scope and effect of the [2006] Release Agreement."  (Dkt. No. 90 at 18.)  But the Court rejected as time-barred the argument that the

---

[12]    The list of 74 compositions as to which the Karen Parties claim infringement in their amended complaint is set forth in Column B of Appendix A to this Opinion.  It is substantially similar to the list for which Guerra and UMU claim infringement, with only a few differences.  The Karen Parties do not allege infringement with respect to *Amen* or *Te Necesito*.  And unlike Guerra and UMU, the Karen Parties claim infringement of the compositions for *Hasta Que Me Olvides*, *Los Mangos Bajitos*, *Me Enamoro De Ella*, *Por Eso Ahora*, *Rock-A-Fiesta*, and *Tengo Una Musiquita*.  (Dkt. No. 91-1 (listing 74 total musical compositions from Guerra, but mis-numbering the total as 72).)

2006 Release Agreement was unenforceable due to Guerra's breach; the motion to supplement the complaint was denied, and Rodríguez's counterclaim was dismissed, to the extent their claims were premised on this unenforceability argument.  (*Id.* at 9–13.)  And the Court denied the Karen Parties' motion for judgment on the pleadings as to UMU and Guerra's counterclaims, holding that neither the 1992 Agreement nor the 2006 Release Agreement was a clear, express claim of ownership by the Karen Parties that would "trigger [Guerra's] obligation to bring an ownership claim within three years."  (Dkt. No. 90 at 20–21.)

After the Court's March 15, 2017 Opinion, the parties proceeded to discovery (Dkt. No. 90 at 22), which was completed on April 30, 2018 (Dkt. No. 119).  UMG, Capitol, Guerra, and UMU—the Defendants, Counterclaimants, and Third-Party Plaintiffs in this action (collectively "Movants")—now move for (i) summary judgment on the copyright infringement and declaratory judgment claims of the Karen Parties, and (ii) partial summary judgment on the copyright infringement and declaratory judgment claims of UMU and Guerra against the Karen Parties.  (Dkt. No. 122.)

## II.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "If the party with the burden of proof makes the requisite initial showing, the burden

shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014) (citing Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250–51). The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting *Lund's, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

## III.   Discussion

Movants seek summary judgment in their favor on the copyright infringement claims brought by the Karen Parties, as well as partial summary judgment on the copyright infringement claims brought by Guerra and UMU.

Section 501 of the Copyright Act provides the "owner of an exclusive right under a copyright" with a cause of action for infringement against "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122." 17 U.S.C. § 501(a), (b). "To maintain an action for infringement, a plaintiff must establish '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)). "Copyright in a work" generally "vests initially in the author or authors of the work," but ownership can be "transferred in whole or in part by any means of conveyance or by operation of law." 17 U.S.C. § 201(a), (d). A certificate of registration creates a rebuttable presumption of copyright ownership, and shifts the burden to the party challenging ownership "to prove the contrary." *Urbont v. Sony Music Entm't*, 831 F.3d 80, 89 (2d Cir. 2016) (quoting *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999)).

Here, whether summary judgment is appropriate on the copyright infringement claims hinges on the interpretation of contractual agreements between the parties.  "In resolving a summary judgment motion involving contract interpretation, 'a court should accord [contract] language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish.'"  *Kookmin Best Ins. Co., Ltd. v. Foremost Ins. Co.*, No. 18 Civ. 782, 2019 WL 1059973, at *4 (S.D.N.Y. Mar. 5, 2019) (quoting *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006)).

"Whether a contract is ambiguous in the first place presents a question of law." *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 88 (2d Cir. 2015).  "Ambiguity is 'defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way.'"  *Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 130 (S.D.N.Y. 2013) (quoting *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)).

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous" because "interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder."  *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir. 2000).  Nevertheless, "[n]o genuine dispute will exist" and summary judgment will thus be appropriate where "'the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary,' or 'if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language.'"  *Luitpold Pharm.,* 784 F.3d at 88 (second quoting *Compagnie Financiere*, 232 F.3d at 158).

### A.  Infringement Claims By the Karen Parties

Movants' motion for summary judgment as to the Karen Parties' copyright infringement claims is mainly premised on the argument that a specific paragraph in the 2006 Release Agreement revoked whatever rights Karen Publishing had in all of the Guerra compositions. (Dkt. No. 124 at 15–20.)  In the alternative, Movants argue that summary judgment is warranted as to a subset of compositions for which the parties have not identified an agreement transferring the composition copyrights, and as to the exploitation of Guerra's compositions on the internet. (Dkt. No. 124 at 20–22.)  The Court addresses each of these bases for summary judgment in turn.

### 1.  Ownership in Wake of the 2006 Release Agreement

Movants primarily argue that the Karen Parties cannot satisfy the first element of their infringement claims—ownership of a valid copyright—in light of the 2006 Release Agreement. Specifically, Movants contend that the "Whereas No. 11" paragraph unambiguously revoked the transfer of copyrights in the parties' earlier agreements; and that, even if that paragraph is ambiguous on this point, the one-sided extrinsic evidence nonetheless warrants summary judgment.  (Dkt. No. 124 at 15–16.)  But before interpreting this paragraph and assessing its ambiguity or lack thereof, the Court must ascertain what this key provision actually says.

The original 2006 Release Agreement was drafted and executed in Spanish.  (Dkt. No. 125-10 at 11–18.)  The relevant passage in the "Whereas No. 11" paragraph provides:

> Las partes . . . han arribado a acuerdos tendentes a un arreglo transaccional con la finalidad de renunciar de manera formal, a los derechos respectivos que les acuerdan los contratos antes mencionados y dirimir por esta vía sus diferencias.

(Dkt. No. 125-10 at 13.)  Movants offer the following translation of this passage:

> The parties . . . have reached a consensus leading to a settlement agreement in order to formally waive their respective rights under the previous agreements and to resolve their differences through these means.

(Dkt. No. 125-10 at 4.)  Movants argue that this paragraph, as so translated, clearly terminated any grant of copyrights to the Karen Parties made in earlier agreements, and thus reverted all ownership rights back to Guerra.  (Dkt. No. 124 at 15–16.)

The Karen Parties offer a different translation of the relevant paragraph in a certified translation submitted in opposition to the motion for summary judgment:

> The parties . . . have reached agreements tending to a settlement agreement with tee [*sic*] finality of resigning in a formal manner, to the respective rights that are granted to them by the aformentioned [*sic*] contracts and to settle their differences in this manner.

(Dkt. No. 133-8 at 2.)[13]  Translated thus, the "Whereas No. 11" paragraph, according to the Karen Parties, waived rights under only two specific agreements between the parties, neither of which involved ownership of composition copyrights.  (Dkt. No. 131 at 5–7.)

The Karen Parties argue that the Court should adopt the translation of the "Whereas No. 11" paragraph from the 2006 Release Agreement that it has submitted over the Movants' proffered translation.  (Dkt. No. 131 at 5–6, 8–9.)  Movants respond that the translation of the 2006 Release Agreement that they offer now is the same translation that the Karen Parties submitted along with their request to supplement the complaint.  (Dkt. No. 137 at 7–8.  *Compare* Dkt. No. 76-2 at 18, *with* Dkt. No. 125-10 at 19.)  Therefore, Movants argue, the Karen Parties should not be allowed to challenge that translation now.  (Dkt. No. 137 at 8.)  But the Court sees no reason that the Karen Parties should not be able to proffer a new, purportedly more accurate

---

[13]     The Karen Parties offer a slightly different translation of the "Whereas No. 11" paragraph in the certified translation of their legal expert's report:
> The parties . . . have reached agreements tending to a settlement agreement with the finality of waiving in a formal manner the respective rights that are granted by the **previously mentioned contracts** and to decide their differences in this manner.
(Dkt. No. 133-3 at 9–10.)

translation of the agreement at the summary judgment stage. And Movants cite no authority to the contrary.

The Court is faced with a dispute over the proper translation of a contractual provision, the interpretation of which is necessary to resolving the parties' dispute. Encountering a similar situation in a case at the motion-to-dismiss stage, the Second Circuit considered the language of the non-movant's translation "to be the prevailing interpretation" because at that stage courts "must view the facts in the light most favorable to" the non-movant. *Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.*, 572 F.3d 86, 90 n.5 (2d Cir. 2009). And faced with this situation at summary judgment, another court in this District found it appropriate to adopt the non-movant's translation of a disputed contractual provision because "the Court looks at the facts in the light most favorable to the non-movant on a motion for summary judgment." *Kasper Glob. Collection & Brokers, Inc. v. Glob. Cabinets & Furniture Mfrs. Inc.*, 952 F. Supp. 2d 542, 552 n.8 (S.D.N.Y. 2013); *see also Atl. Grp. Ltd. v. The Interpublic Grp. of Companies, Inc.*, No. 00 Civ. 7845, 2007 WL 2049728, at *3 n.2 (S.D.N.Y. July 16, 2007) (using the non-movant's proposed translation of a contract on summary judgment). Following these cases, the Court determines that it is appropriate to adopt the translation of the non-moving parties—the Karen Parties—for the purposes of resolving the motion for summary judgment.

Movants briefly argue that even if the Karen Parties' translation of the "Whereas No. 11" paragraph is applied by the Court, the uncontested evidence of the parties' intent "is more than enough to warrant summary judgment dismissing Karen's claims." (Dkt. No. 137 at 8.) But this argument ignores the proper steps of the Court's analysis.

As Movants' opening brief makes plain, their motion for summary judgment is premised on the argument that the "Whereas No. 11" paragraph alone in the 2006 Release Agreement unambiguously terminated any rights to Guerra's compositions that had been granted to the

Karen Parties in earlier agreements.[14]  (Dkt. No. 124 at 15–16.)  The Court must thus first

determine whether the operative paragraph is unambiguous on this score; and, if it is not, the

Court can then consider extrinsic evidence to determine whether such evidence leaves no

genuine dispute about the parties' intended meaning.  *See Sec. Plans, Inc. v. CUNA Mut. Ins.*

*Soc.*, 769 F.3d 807, 816 (2d Cir. 2014) ("Evidence outside the four corners of the document as to

what was really intended but unstated or misstated is generally inadmissible to add to or vary the

writing.  Parol evidence is admissible only if a court finds an ambiguity in the contract."

(internal quotation marks and citations omitted)).  (*See* Dkt. No. 137 at 2 n.2 (noting agreement

of the parties that "when interpreting *ambiguous* contracts under Dominican law, the Court may

consider extraneous evidence of the parties' intent" (emphasis added)).)

        As the Karen Parties' translation of the "Whereas No. 11" paragraph states, in executing

the 2006 Release Agreement, the parties agreed to waive "the respective rights that are granted to

them by the aformentioned [*sic*] contracts and to settle their differences in this manner."  (Dkt.

No. 133-8 at 2; *see also* Dkt. No. 133-3 at 9–10.)  Under its plain meaning, the phrase

"aforementioned contracts" encompasses the contracts previously mentioned in the 2006 Release

Agreement.  And the only contracts between the parties mentioned in that agreement are the

1988 Base Agreement and the 1992 Modification.  (Dkt. No. 125-10 at 2.)  Therefore, the Court

concludes that the "Whereas No. 11" paragraph unambiguously waives the rights of the parties

as to the 1988 Base Agreement and the 1992 Modification, but not the rights granted in any other

agreements.  (*See* Dkt. No. 133-3 at 10.)  And because the rights in Guerra's compositions were

---

[14]      To the extent Movants discuss other provisions in the 2006 Release Agreement—namely paragraph "Seventh"—it is only as "objective evidence" to support their interpretation of the agreement in the event that the "Whereas No. 11" paragraph is determined to be ambiguous. (Dkt. No. 124 at 16–17.)  But Movants do not claim that paragraph "Seventh," or any provision in the agreement other than the "Whereas No. 11" paragraph, caused any rights in the compositions at issue to revert back to Guerra.

granted to Karen Publishing in the Cesión Documents and the 1992 Agreement—*not* the 1988 Base Agreement or the 1992 Modification (SUF ¶¶ 10–11, 15, 17)—these rights were not revoked by the "Whereas No. 11" paragraph in the 2006 Release Agreement.

Accordingly, the Court determines that the "Whereas No. 11" paragraph, as translated by the Karen Parties, unambiguously did not cause ownership of rights in the compositions at issue to revert back to Guerra. Holding this provision to be unambiguous, the Court will not consider the extrinsic evidence of the parties' intent offered by Movants. *See Sec. Plans*, 769 F.3d at 816. Movants have thus failed to adequately demonstrate at this stage of the litigation that this particular paragraph of the 2006 Release Agreement terminated whatever rights Karen Publishing holds in the musical compositions at issue.

## 2.   Subset of Compositions Not Identified in Agreements

Movants also seek partial summary judgment on the Karen Parties' infringement claims as to 20 of the 74 compositions, on the ground that there is no evidence of an agreement transferring rights in these compositions to the Karen Parties in the first place.[15] (Dkt. No. 124 at 20.) Guerra and UMU raised this same argument at an earlier stage of the litigation, at which point the Court held that an assertion in the Karen Parties' proposed supplemental pleading, that they were "the 'worldwide exclusive owners of the copyright rights and exclusive rights'" in the compositions at issue was enough to "carry[ their] burden with respect to those compositions." (Dkt. No. 90 at 14 n.6 (quoting (Dkt. No. 59-1 ¶¶ 13, 15).)

According to Movants, however, the Karen Parties have failed to adduce any evidence at the summary judgment stage to support that assertion. Specifically, Movants argue that, because

---

[15]      The 20 compositions which Movants argue that Guerra never assigned to the Karen Parties are listed in Column E of Appendix A to this Opinion. (*See* Dkt. No. 124 at 12 n.7.)

the rights in these 20 compositions were not specifically transferred in the 1992 Agreement or the Cesión Documents—and there is no document in evidence transferring rights in Guerra's compositions wholesale—there is thus no genuine dispute of fact as to the ownership of these 20 compositions. (Dkt. No. 124 at 20–21.)

The only response of the Karen Parties is to highlight a dispute between the parties' legal experts regarding whether "the laws of the Dominican Republic prohibit the transfer of works that have not yet been created." (Dkt. No. 131 at 16.) But this argument is inapposite, because the Karen Parties have not identified any agreement by which Guerra purported to transfer the rights in any future compositions. Indeed, Movants noted in their Rule 56.1 statement that the 1992 Agreement "did not give Karen any rights to any other compositions that Guerra had created or that he would create in the future," and the Karen Parties did not specifically controvert this fact. (SUF ¶ 17; *see* SUF ¶¶ 10–11.)

In light of their registration of these copyrights, the Karen Parties are correct that there is a rebuttable presumption of valid ownership which Movants bear the burden of disproving. (Dkt. No. 131 at 3–4.) But the presumption of ownership can be rebutted where there is no evidence that putative owners "obtained a valid written assignment of [] copyright ownership before these registration certificates were issued." *Mason v. Jamie Music Publ'g. Co.*, 658 F. Supp. 2d 571, 584 (S.D.N.Y. 2009). And ultimately, if "the party bearing the burden of proof at trial" presents "evidence on each element of its claim" at the summary judgment stage, "the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial." *Clopay Plastic Prod. Co.*, 2014 WL 4652548, at *3.

Here, Movants have adduced evidence of the contracts between the parties and shown a lack of agreement to transfer interests in the 20 compositions at issue, rebutting the presumption of the Karen Parties' copyright ownership. And in response, the Karen Parties have failed to

18

provide evidence of such an agreement to support the ownership element of their copyright infringement claim.

Given the state of the record, the Court concludes that no reasonable jury could find in favor of the Karen Parties as to the ownership of the copyrights in these 20 compositions. Accordingly, the motion for summary judgment on the Karen Parties' infringement claims is granted as to these 20 compositions.

### 3. Rights in Internet Exploitation

Movants also seek summary judgment on the Karen Parties' claims to the extent they are premised on the alleged infringement "of Guerra's compositions through exploitation in digital format on the Internet." (Dkt. No. 124 at 21.)

The relevant contractual language for this aspect of the motion, paragraph fourteen of the 1992 Agreement provides that "[t]he assignment of the rights agreed to herein does not extend to the modes of use or medium of dissemination not existing or unknown at the time of the assignment." (Dkt. No. 125-7 at 5.) However, should Karen Publishing "wish to exploit the rights using a new mode or new medium currently unknown, it shall irrefutably communicate this fact to" Guerra, who is deemed to be in full agreement with exploitation over the new mode or medium if "he does not voice any reservation" within fifteen days. (*Id.*)

The Karen Parties argue that the exploitation of the musical compositions at issue in digital format on the internet falls within the grant of the 1992 Agreement for two reasons.

*First*, they contend that the internet "existed, and was known as of October, 1992," and thus does not constitute a new mode of use or medium of dissemination. (Dkt. No. 131 at 19.) To support this proposition, the Karen Parties cite a number of articles surveying the state of the internet around the time the 1992 Agreement was executed. (*See* SUF ¶ 22.) Movants respond that exploiting the musical compositions on the internet avoids the restriction in paragraph

19

fourteen of the 1992 Agreement "only if the Internet existed at that time as a mode of use or medium of dissemination *for Guerra's musical compositions*," but the Karen Parties have offered no evidence "that the Internet was used in 1992 for digital downloading, streaming or any other form of exploitation of music." (Dkt. No. 137 at 8.) Movants are correct.

Under paragraph fourteen, the assignment of the rights did not encompass any "modes of use or medium of dissemination not existing or unknown" in October 1992. (Dkt. No. 125-7 at 5.) This unambiguously refers to a mode of use or medium of dissemination *of musical compositions*. It is thus not enough to show that a particular medium existed in October 1992. Rather, it must have existed or been known at the time as a medium of dissemination of musical compositions. Although the articles cited by the Karen Parties demonstrate that the internet existed in some form in October 1992, they say nothing about the use of the internet at that time to disseminate music. (*See* SUF ¶ 22.) Nor is there any evidence of the parties' knowledge of the potential use of the internet for such a purpose at the time. (*See* SUF ¶ 23.) The Karen Parties have thus failed to demonstrate a genuine dispute of material fact as to whether the 1992 Agreement granted them the right to exploit Guerra's musical composition over the internet.

*Second*, even if the internet was an unknown mode of use or medium of dissemination in October 1992, the Karen Parties contend that Guerra consented to such digital exploitation. (Dkt. No. 131 at 20–21.) Specifically, the Karen Parties contend that the Sociedad General de Autores y Editores ("SGAE")—an entity that managed royalties for Guerra and Karen Publishing—sent notices to Guerra as Karen Publishing's agent, informing Guerra that the compositions were being exploited on the internet, but that Guerra did not object within the

allotted fifteen days.[16]  (Dkt. No. 131 at 20; *see* SUF ¶¶ 19, 24; Dkt. No. 132 ¶¶ 4, 6; Dkt. Nos.

133-4 through 133-5; Dkt. No. 133-6 at 18:24–19:10.)

　　Movants respond that the 1992 Agreement required Karen Publishing itself to directly

notify Guerra, not SGAE.[17]  (Dkt. No. 137 at 9–10.)  But although the contract states that

"PUBLISHER . . . shall irrefutably communicate this fact to AUTHOR" (Dkt. No. 125-7 at 5),

the contract does not prohibit Karen Publishing from communicating its intent indirectly to

Guerra, such as through an agent, as long as the communication is "irrefutabl[e]."  Movants

further argue that Karen Publishing is not mentioned in the summary sheets of the SGAE reports,

and thus cannot "demonstrate that Karen 'irrefutably communicate[d]' to Guerra that it intended

to exploit his compositions on the [i]nternet."  (Dkt. No. 137 at 10.)  However, if SGAE was

acting as the agent of Karen Publishing in sending these reports to Guerra, it can be reasonably

inferred that the underlying notices referenced Karen Publishing, or that all involved irrefutably

understood the referenced internet exploitation to have been undertaken by the principal: Karen

Publishing.

　　Overall, the Karen Parties have demonstrated a genuine dispute of fact as to whether they

communicated to Guerra their intent to exploit the compositions at issue in digital format as

required by paragraph fourteen of the 1992 Agreement.  Therefore, Movants' motion for partial

---

[16]　　The Karen Parties also argue that paragraph "Fourth" of the 2006 Release Agreement informed Guerra that the songs would be exploited by "any method," to which Guerra again did not object.  (Dkt. No. 131 at 20–21 (referencing Dkt. No. 125-10 at 5).)  However, as Movants properly note, paragraph "Fourth" covers rights in "recordings"—not compositions—and thus cannot support the argument that Guerra was irrefutably on notice of the exploitation of the compositions at issue in digital format.  (Dkt. No. 137 at 10; Dkt. No. 90 at 16–17.)

[17]　　Movants also argue that the Court cannot consider the documents that SGAE sent to Guerra as evidence, because they were not submitted along with a certified translation.  (Dkt. No. 137 at 9; *see* Dkt. No. 133-5.)  However, because Movants do not actually dispute the Karen Parties' characterization of the contents of these documents, the Court will consider them.

summary judgment on the Karen Parties' claims, to the extent those claims are premised on the exploitation of compositions in digital format over the internet, is denied.

### B.  Infringement Claims By Guerra and UMU

Movants also seek partial summary judgment on Guerra's and UMU's infringement claims against the Karen Parties as to 58 of the 70 compositions that were the subject of their claims.[18]  (Dkt. No. 124 at 23.)  The parties agree that the Karen Parties have licensed or authorized the licensing of these 58 compositions, sufficient to satisfy the "copying" element of Guerra and UMU's infringement claims.  (Dkt. No. 124 at 22–23; SUF ¶¶ 50–52.)  Both sides also agree that the question of ownership as to these 58 compositions will be determined by the analysis of ownership above.  (Dkt. No. 124 at 22; Dkt. No. 131 at 21; Dkt. No. 137 at 12.)

As explained above, *supra* Section III.A.1, the Court holds that there is a genuine dispute of material fact as to whether the 2006 Release Agreement reverted any rights in the compositions back to Guerra.  Movants have thus failed to demonstrate their ownership of the 58 compositions at issue on this basis.  However, for the 20 compositions for which there is no evidence in the record of an agreement transferring rights to the Karen Parties, the Court has determined that there is no genuine dispute as to Guerra's ownership, *supra* Section III.A.2. Because Movants seek partial summary judgment on Guerra and UMU's claims involving 12 of these 20 compositions,[19] and both the "ownership" and "copying" elements are satisfied as to these 12 compositions, the motion will be granted absent some extrinsic ground for denial.

---

[18]     These 58 compositions are listed in Column D of Appendix A to this Opinion. (*See* Dkt. No. 124 at 10 nn. 3–5.)

[19]     These 12 compositions are: *Amapola, Areito*, *El Costo De La Vida*, *El Niagara En Bicicleta*, *El Primo*, *La Hormiguita*, *Mi PC*, *Palomita Blanca*, *Quisiera*, *Señorita*, *Testimonio*, and *Vale La Pena*.  (Dkt. No. 137 at 12 n.11.)

The Karen Parties raise three such arguments against Movants' motion for partial summary judgment on UMU and Guerra's claims: (i) statute of limitations; (ii) breach of the 2006 Release Agreement; and (iii) lack of registration of the copyrights.  The Court addresses each in turn.

### 1.  Statute of Limitations

First, the Karen Parties contend that Guerra's assertion of ownership over the compositions is barred by the applicable statute of limitations.  (Dkt. No. 131 at 22.)  Section 507(b) of the Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  In particular, a claim of copyright ownership "accrues only once, when 'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'"  *Kwan*, 634 F.3d at 228 (quoting *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992)).

The Karen Parties argue that Guerra's ownership claims accrued more than fifteen years ago, when the last of the copyrights at issue was registered.[20]  (Dkt. No. 131 at 22.)  Specifically, they contend that Guerra had "contemporaneous knowledge" that Karen Publishing was registering the composition copyrights at issue with the U.S. Copyright Office, and that a "reasonably diligent" author would have checked the registrations and seen that "Karen Publishing claimed sole ownership of each of these copyrights."  (Dkt. No. 131 at 22; *see* SUF ¶ 53.)

---

[20]    The Court notes that the Karen Parties raised a similar statute of limitations argument in their motion for judgment on the pleadings, regarding whether the Karen Parties expressly claimed ownership of the compositions in the 1992 Agreement or 2006 Release Agreement so as to cause Guerra's ownership claim to accrue.  (Dkt. No. 90 at 18–21.)  The Court rejected this argument, but the earlier holding is not dispositive of the question here.

Movants do not dispute that Guerra knew that the Karen Parties were filing copyright registrations. (Dkt. No. 137 at 13; *see* Dkt. No. 133-14 at 38:18–39:7.) But they contend that Guerra lacked sufficient knowledge about the registrations to put him notice of the adverse ownership claim, and that Guerra did not have an obligation to check the registrations. (Dkt. No. 137 at 13–14; *see* Dkt. No. 138-4 at 54:22–56:17.) The Court agrees.

Guerra testified that he knew that Rodríguez was filing copyright registrations for his songs and compositions as part of their business relationship, but that Rodríguez handled all of the registrations without Guerra's involvement. (*See* Dkt. No. 138-4 at 55:18–25.) Guerra further testified that he never saw the actual copyright registration documents for his compositions that were filed by Karen Publishing while the Karen Parties represented him. (*See* Dkt. No. 133-14 at 44:1–12.) The Karen Parties contend that Guerra's knowledge of the registration filings, alone, should have put him on notice of a potential adverse ownership claim as to the compositions and caused him to check the registrations. (Dkt. No. 131 at 22.)

But as the Second Circuit has reasoned, "[i]f mere registration of a copyright without more sufficed to trigger the accrual of an ownership claim, then rightful owners would be forced to maintain constant vigil over new registrations. Such a requirement would be vastly more burdensome than the obligations that 'a reasonably diligent plaintiff' would undertake." *Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 119 (2d Cir. 2018) (quoting *Kwan*, 634 F.3d at 228). The Second Circuit concluded that authors should not "lose their rights merely by virtue of failing to monitor." *Id.*

This logic applies equally to a situation where an author knows that his designated representative is filing copyright registrations with respect to his work, but has no cause to suspect that those registrations are asserting a claim of ownership inconsistent with the author's understanding. A "reasonably diligent" author—who believes himself the owner of certain

rights in his compositions and whose publisher is authorized to handle registrations on his behalf—is not "put on inquiry as to the existence" of the publisher's claimed ownership by the mere fact of the publisher filing contemplated copyright registrations of unknown contents. *Wilson*, 892 F.3d at 118 (quoting *Kwan*, 634 at 228). Any other result would cause authors to unfairly "lose their rights merely by virtue of failing to monitor" their own agents and representatives, upon whom authors reasonably rely to handle their business arrangements in good faith. *Id.*

Here, the filing of copyright registrations was an anticipated part of the relationship between Guerra and his record label and publisher. (*See* Dkt. No. 133-14 at 38:18–39:1.) And apart from a general awareness of such registrations, the Karen Parties offer no reason that Guerra should have suspected that Karen Publishing used the U.S. copyright registrations to claim exclusive ownership of the compositions. (*See* Dkt. No. 131 at 22.) Under these circumstances, knowledge of registrations alone would not have put a "reasonably diligent" author on notice of a competing ownership claim.

Accordingly, the Court concludes that Guerra's ownership claims over the compositions at issue did not accrue with the filing of their respective copyright registrations. Guerra's ownership claims—and the related infringement claims—are thus not time-barred on this basis.

### 2. Breach of 2006 Release Agreement

Next, the Karen Parties argue that Guerra's failure to comply with his material obligations under the 2006 Release Agreement prevent Movants from relying on this agreement to establish Guerra's ownership over the compositions at issue. (Dkt. No. 131 at 23–24.) As an initial matter, this argument does not implicate the compositions for which Movants do not depend on the 2006 Release Agreement to establish ownership, namely those 12 compositions for which the Karen Parties have not adduced evidence of a transfer of rights. For the remaining

compositions, although the Court has already determined that summary judgment is inappropriate because a genuine dispute of fact exists as to ownership, the Court will address this argument to help narrow the issues to be resolved in later stages of this case.

In the Opinion of March 15, 2017, the Court rejected the Karen Parties' claims for a declaratory judgment that the 2006 Release Agreement was unenforceable due to Guerra's breach, concluding that such claims were time-barred.  (Dkt. No. 90 at 9–13.)  Here, the Karen Parties reiterate this previously rejected claim of unenforceability in opposition to Movants' infringement claims.  (Dkt. No. 131 at 23–24.)  And in a brief footnote at the end of this section of their brief, the Karen Parties assert that, unlike with their counterclaims, as an affirmative defense this challenge to enforceability is not barred by the statute of limitations.  (Dkt. No. 131 at 24 n.3.)  As an initial matter, "[a]rguments which appear in footnotes are generally deemed to have been waived."  *In re MF Glob. Holdings Ltd. Inv. Litig.*, No. 11 Civ. 7866, 2014 WL 8184606, at *2 (S.D.N.Y. Mar. 11, 2014) (quoting *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007)).

Regardless, the assertion that repackaging the claim of unenforceability as an affirmative defense would avoid the statute-of-limitations issue is unavailing.  The one case on which the Karen Parties rely for this proposition, *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003), held that the statute of limitations in the Copyright Act applied to claims but not affirmative defenses.  But this conclusion was based on the language of the applicable provision—which specifically referred to a "claim" that "accrued"—and on the fact that statutes of limitations normally do not run against affirmative defenses under federal law. *Id*. at 163–64 (citing 17 U.S.C. § 507(b)).  Here, the applicable New York statute specifically indicates that the statute of limitations applies with equal force to a "defense or counterclaim." N.Y. C.P.L.R. § 203(d).  And, as another court in this District has recognized, the federal rule

against applying statutes of limitations to affirmative defenses does not apply when New York law governs. *See 133-24 Sanford Ave. Realty Corp. v. Cisneros*, 940 F. Supp. 83, 85 (S.D.N.Y. 1996) (citing *118 E. 60th Owners, Inc. v. Bonner Props., Inc.*, 677 F.2d 200 (2d Cir. 1982)).

The Karen Parties offer no reason why the federal rule should apply to their assertion of a state-law affirmative defense, despite the fact that the substance of the argument is grounded in state law and the defense would be time-barred if brought in a state court. And the Court can divine no such reason from a survey of the applicable precedent. *See Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 110 (1945) (noting "the crucial consideration that if a plea of the statute of limitations would bar recovery in a State court, a federal court ought not to afford recovery"); *Van Gemert v. Boeing Co.*, 553 F.2d 812, 813 (2d Cir. 1977) ("It is the source of the right, not the basis of federal jurisdiction, which determines the controlling law."); *Picture Patents, LLC v. Aeropostale, Inc.*, 788 F. Supp. 2d 127, 139 (S.D.N.Y. 2011) ("[S]tate law determines whether statutes of limitations apply to defenses and counterclaims based on patent ownership." (citing *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 839–41, 846–48 (Fed. Cir. 2009))).

Indeed, it would be unreasonable for a court to hold an argument based on state law to be time-barred when presented as a counterclaim, but later in the same litigation to hold the identical argument not barred merely because it is presented in the form of an affirmative defense. *See Local 144 Hotel, Hosp., Nursing Home & Allied Servs. Union v. C.N.H. Mgmt. Assocs., Inc.*, 752 F. Supp. 1195, 1205–06 (S.D.N.Y. 1990) (holding that an affirmative defense was time-barred, with reference to N.Y. C.P.L.R. § 203, where a "counterclaim based on the same allegations" was previously dismissed "on the grounds that it was barred by the statute of limitations"). Furthermore, applying the New York statute of limitations to bar the unenforceability claim here is consistent with the purpose of the state limitations law, and "the

27

Case 1:13-cv-07706-JPO   Document 140   Filed 03/29/19   Page 28 of 32

intrinsically defensive nature of the doctrine." *118 E. 60th Owners, Inc.*, 677 F.2d at 204

("When a party is 'attacked,' he can rely on the statute of limitations as a shield, but when a

party is the 'aggressor,' equity precludes the use of the time bar as a sword.").

     Accordingly, substantially for the reasons discussed in the Opinion of March 15, 2017

(Dkt. No. 90 at 11–13), the Karen Parties' breach of contract defense is rejected as time-barred.

### 3.  Registration Requirement

     Finally, the Karen Parties argue that because Guerra and UMU have not registered any

copyrights in the compositions at issue with the U.S. Copyright Office, their infringement claims

must be dismissed.  (Dkt. No. 131 at 24–27.)  Section 411(a) of the Copyright Act states in

relevant part that "no civil action for infringement of the copyright in any United States work

shall be instituted until preregistration or registration of the copyright claim has been made in

accordance with this title."  17 U.S.C.A. § 411(a).  As the Court explained in the March 15, 2017

Opinion, however, "section 411(a) does not require [infringement plaintiffs] to be the ones who

registered the copyright" at issue.  (Dkt. No. 90 at 7.)  Rather, section 411(a) is satisfied by proof

of registration of the copyright at issue alone, regardless of the identity of the registrant.

     The Karen Parties ask the Court to reconsider its holding, arguing that the case on which

the Court relied for this proposition—*Vapac Music Publ'g, Inc. v. Tuff 'N' Rumble Mgmt.*, No.

99 Civ. 10656, 2000 WL 1006257, at *2 (S.D.N.Y. July 19, 2000)—relied on the incorrect

assumption that section 411(a) constituted a jurisdictional requirement, rather than an element of

a copyright claim.  (Dkt. No. 131 at 25.)  But the fact that *Vapac* was mistaken as to whether the

section 411(a) registration requirement presents a jurisdictional issue is no basis for this Court to

revisit its holding that the requirement is satisfied if someone other than the infringement

plaintiffs obtained the registration.  The courts to consider the issue have held that the passive

wording of section 411(a) itself warrants this result.  *See, e.g.*, *Vapac*, 2000 WL 1006257, at *2;

*Isbell v. DM Records, Inc.*, No. 02 Civ. 1408, 2004 WL 1243153, at *3 (N.D. Tex. June 4, 2004);

*Liu v. Price Waterhouse LLP*, 182 F. Supp. 2d 666, 676 (N.D. Ill. 2001).  The policy arguments

presented by the Karen Parties (Dkt. No. 131 at 26) are insufficiently persuasive to require a

result contrary to the plain language of the statute.[21]

Accordingly, reaffirming that section 411(a) is satisfied by the registration of copyrights

by parties other than the infringement plaintiffs, the Court rejects the Karen Parties' request to

dismiss Guerra and UMU's infringement claims for lack of proper registration.

\* \* \*

Having rejected the Karen Parties' three arguments against summary judgment

notwithstanding Guerra's ownership of the composition copyrights at issue, the Court grants

Movants' motion for partial summary judgment on Guerra's and UMU's claims as to the 12

compositions as to which the Karen Parties have admitted infringement and there is no

agreement transferring rights to Karen Publishing.

**IV.     Conclusion**

For the foregoing reasons, the motion for summary judgment of UMG, Capitol, Guerra,

and UMU is GRANTED in part and DENIED in part.

The Clerk of Court is directed to close the motion at Docket Number 122.

SO ORDERED.

Dated: March 29, 2019
        New York, New York

_____
                  J. PAUL OETKEN
              United States District Judge

---

[21]     The Karen Parties briefly contend that by failing to register the copyrights at issue
in their names, Guerra and UMU are not entitled to statutory damages in this action.  (Dkt. No.
131 at 26.)  The Court defers consideration of this challenge to available remedies to a later stage
in this case, when it has been more thoroughly addressed by the parties.

**Appendix A:  List of Song Compositions and Related Claims**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | Name of Song | Karen Parties claim infringement[22] | Guerra and UMU claim infringement[23] | Movants seek summary judgment on Guerra and UMU claims[24] | Movants seek summary judgment on subset of Karen Parties' claims[25] | Summary judgment granted[26] |
| 1 | A Billirubina | X | X | | X | X |
| 2 | A Pedir Su Mano | X | X | X | | |
| 3 | Acompáñame Civil | X | X | X | | |
| 4 | Amapola | X | X | X | X | X |
| 5 | Amen | | X | | | |
| 6 | Amigos | X | X | X | | |
| 7 | Amor De Conuco | X | X | X | | |
| 8 | Ángel Para Una Tambora | X | X | X | | |
| 9 | Areito | X | X | X | X | X |
| 10 | Ay Mujer | X | X | X | | |
| 11 | Ayer | X | X | X | | |
| 12 | Bachata Rosa | X | X | X | | |
| 13 | Burbujas De Amor | X | X | X | | |
| 14 | Canción De Cuna Para Una Mujer | X | X | | | |
| 15 | Carta De Amor | X | X | X | | |
| 16 | Como Abeja Al Panal | X | X | X | | |
| 17 | Coronita De Flores | X | X | X | | |
| 18 | Cuando Te Beso | X | X | X | | |
| 19 | De Tu Boca | X | X | X | | |
| 20 | El Beso De La Ciguatera | X | X | X | | |

---

[22]   (Dkt. No. 91-1.)
[23]   (Dkt. No. 31 at Exh. A.)
[24]   (Dkt. No. 124 at 10 nn. 3–5.)
[25]   (Dkt. No. 124 at 12 n.7.)
[26]   *See supra* Section III.A.2, Section III.B.

| 21 | El Costo de la Vida | X | X | X | X | X |
|----|---------------------|---|---|---|---|---|
| 22 | El Farolito | X | X | X | | |
| 23 | El Niagara en Bicicleta | X | X | X | X | X |
| 24 | El Primo | X | X | X | X | X |
| 25 | Elena | X | X | X | | |
| 26 | Ella Dice | X | X | X | | |
| 27 | Estrellitas Y Duendes | X | X | X | | |
| 28 | Fogaraté | X | X | X | | |
| 29 | Frío Frío | X | X | X | | |
| 30 | Guavaberry | X | X | X | | |
| 31 | July 19th | X | X | X | | |
| 32 | La Bilirrubina | X | X | X | | |
| 33 | La Cosquillita | X | X | X | | |
| 34 | La Gallera | X | X | X | | |
| 35 | La Hormiguita | X | X | X | X | X |
| 36 | Lacrimosa | X | X | X | | |
| 37 | Lágrimas De Un Pino Verde | X | X | | | |
| 38 | Los Pajaritos | X | X | X | | |
| 39 | Mal De Amor | X | X | | | |
| 40 | Mi PC | X | X | X | X | X |
| 41 | Naboria Daca Mayanimacana | X | X | X | | |
| 42 | No He Podido Verte | X | X | | X | X |
| 43 | No Me Acostumbro | X | X | X | | |
| 44 | Nuestro Amor | X | X | X | | |
| 45 | Oficio De Enamorado | X | X | X | | |
| 46 | Ojalá Que Llueva Café | X | X | X | | |
| 47 | Oxala Que Chova Café | X | X | | X | X |
| 48 | Palomita Blanca | X | X | X | X | X |
| 49 | Quisiera | X | X | X | X | X |
| 50 | Razones | X | X | X | | |
| 51 | Reforéstame | X | X | X | | |
| 52 | Reina Mía | X | X | X | | |
| 53 | Réquiem Sobre El Jaragua | X | X | | | |
| 54 | Romance Rosa | X | X | | X | X |

| | | | | | |
|---|---|---|---|---|---|
| 55 | Rompiendo Fuente | X | X | X | | |
| 56 | Rosalía | X | X | X | | |
| 57 | Señales De Humo | X | X | X | | |
| 58 | Senorita | X | X | X | X | X |
| 59 | Si Saliera Petróleo | X | X | X | | |
| 60 | Si Tú Te Vas | X | X | X | | |
| 61 | Sobremesa | X | X | | | |
| 62 | Soplando | X | X | | X | X |
| 63 | Te Necesito | | X | | | |
| 64 | Te Ofrezco | X | X | X | | |
| 65 | Te Propongo | X | X | X | | |
| 66 | Testimonio | X | X | X | X | X |
| 67 | Tú | X | X | X | | |
| 68 | Vale la Pena | X | X | X | X | X |
| 69 | Visa Para Un Sueño | X | X | X | | |
| 70 | Viviré | X | X | X | | |
| 71 | Hasta Que Me Olvides | X | | | | |
| 72 | Los Mangos Bajitos | X | | | X | X |
| 73 | Me Enamoro De Ella | X | | | | |
| 74 | Por Eso Ahora | X | | | X | X |
| 75 | Rock-A-Fiesta | X | | | | |
| 76 | Tengo Una Musiquita | X | | | X | X |